UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| FRONTIER FISHING CORP., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | CIVIL ACTION NO. |
| GARY LOCKE, Secretary of the United | ) | 10-10162-DPW |
| States Department of Commerce; and | ) | |
| JANE LUBCHENCO, Under Secretary for | ) | |
| Oceans and Atmosphere/Administrator | ) | |
| and Deputy Under Secretary, | ) | |
| | ) | |
| Defendants. | ) | |

MEMORANDUM AND ORDER
May 13, 2013

Plaintiff Frontier Fishing Corp. brought this action against
the Secretary of the Department of Commerce and the Under
Secretary for the Oceans and Atmosphere (collectively, the
"Defendants"), challenging the imposition of penalties by the
National Oceanic and Atmospheric Administration ("NOAA" or
"Agency") for allegedly fishing in a restricted gear area in
violation of the Magnuson-Stevens Fishery Conservation Management
Act (the "Magnuson-Stevens Act"), 16 U.S.C. §§ 1801, and its
underlying regulation, 50 C.F.R. § 648.81(j)(1).

The matter was previously appealed before me and remanded
for further review. *See Frontier Fishing Fishing Corp.* v. *Evans*,
429 F. Supp. 2d 316 (D. Mass. 2006) ("*Frontier I*"). After
extensive proceedings upon remand, the NOAA Administrator

1

affirmed on the merits.  Having fully reviewed and considered the administrative record, I find the NOAA Administrator's Order to be supported by substantial evidence.  Despite a troubling evidentiary anomaly, I have affirmed the NOAA's decision and deny Frontier Fishing's motion for summary judgment.  This Memorandum sets forth the promised extended explanation for these rulings and I will direct the Clerk to enter judgment on this basis.

## I.  BACKGROUND

### A.  *The Facts*[1]

The alleged fishing violation occurred in an area located southeast of Nantucket, Massachusetts known as Restricted Gear Area One ("RGA1").[2]  (Administrative Record ("AR04")[3] III, Tr. at 30.)  RGA1 was closed to fishing vessels with mobile gear, such as trawls,[4] from October 1 to June 15, unless the fishing vessel was transiting with its fishing gear retained on the deck and not

---

[1]  In this section, I recite the facts contained in my March 31, 2006 Memorandum and Order as supplemented by evidence contained in the administrative record filed in the present action.

[2]  Restricted Gear Area One is defined in 50 C.F.R. § 648.81(j)(1).

[3]  Because a separate administrative record exists for each action, I will refer to the Administrative Record for Civil Action 04-cv-11171 as "AR04" and to the Administrative Record for Civil Action 10-10162 as "AR10."  Together, the 2004 and 2010 administrative records amount to twelve volumes.

[4]  Trawl means "gear consisting of a net that is towed" in order to capture fish.  50 C.F.R. § 648.2.

available for immediate use pursuant to 50 C.F.R. §
648.14(a)(98).  (*Id.* at 340.)  During that time period, RGA1 was
only open to fixed fishing gear, such as lobster pots that are
marked by "high-flyers."[5]  (*Id.* at 144.)  On the evening of
October 16, 1997, Manuel Valente[6] served as Captain and Operator
of the fishing vessel Settler ("F/V SETTLER"), a vessel owned by
Frontier Fishing.  (Joint Stipulations of Fact ("JSF"), AR04 II,
Tab 89, ¶ 2.)  The F/V SETTLER left New Bedford, Massachusetts
that evening on a fishing trip for monkfish.  (*Id.* ¶ 11; AR04 IV,
Tr. at 499.)  Prior to departure, Captain Valente plotted[7] the
coordinates of RGA1 and manually entered a waypoint located
outside RGA1, identified as Point D.  (AR04 IV, Tr. 539; AR04 V,
Respondents Ex. 6.)  Captain Valente testified that the F/V

---

[5]  A high-flyer means "a flag, radar reflector or radio
beacon transmitter, suitable for attachment to a longline to
facilitate its location and retrieval."  50 C.F.R. § 635.2.

[6]  Manuel Valente is not formerly a party to this appeal.
Any decision issued in this case by the Administrative Law Judge
("ALJ") or the Administrator of the National Oceanic and
Atmospheric Administration ("NOAA"), however, is binding on both
Frontier Fishing and Captain Valente as joint and several
respondents.  *See generally* 15 C.F.R. § 904.107(c) ("A final
administrative decision by the Judge or the Administrator after a
hearing requested by one joint and several respondent is binding
on all parties including all other joint and several
respondent(s), whether or not they entered an appearance unless
they have otherwise resolved the matter through settlement with
the Agency.").

[7]  Plotting means to mark a point on a navigational chart
indicating the position of a target identified electronically by
radar.  (*See* AR04 III, Tr. at 203.)

SETTLER was in RGA1 that evening but only began trawling at Point D. (AR04 IV, Tr. at 530-32.) He also stated that the F/V SETTLER was on autopilot while he was working on the deck. (*Id.* at 537, 568.) The F/V SETTLER was engaged in fishing, as defined by the Magnuson-Stevens Act, from 21:30 through 22:08.[8] (JSF, AR04 II, Tab 89, ¶ 10.) There is no dispute that the F/V SETTLER's LORAN navigational system functioned properly at all relevant times. (JSF, AR04 II, Tab 89, ¶ 13; AR04 IV, Tr. 518-19.)

On that evening, the United States Coast Guard Cutter Spencer ("USCGC SPENCER"), a 270-foot medium endurance cutter, conducted a routine patrol in international waters approximately seventy miles southeast of Nantucket. (JSF, AR04 II, Tab 89, ¶ 3; AR04 III, Tr. at 28, 30-31, 42, 83.) The USCGC SPENCER was equipped with a Digital Global Positioning System ("DGPS"), a LORAN navigational system, a gyro, and an SPS-64 radar, all of which were functioning properly at all relevant times. (AR10 V, Tab. 57, p. 8 ¶ 8; AR04 V, Agency Ex. 17, 21, 30; AR III, Tr. at 206-12, 278-79, 381.) The radar was set to a 12-mile range. (AR04 III, Tr. at 37.) Lieutenant Commander Charley Diaz was the Executive Officer and Underway Officer on Deck ("OOD"). Ensign

---

[8] Throughout this Memorandum, I will refer to relevant times according to 24-hour, military time designations in accordance with the underlying record. For instance 21:30 refers to 9:30 pm.

Toomey was the break-in OOD and Conning Officer.  Matthew Coppola was the Quartermaster for the 20:00 to 24:00 watch on the USCGC SPENCER that night.  (JSF, AR04 II, Tab 89, ¶¶ 4-6.)  During the relevant time period, visibility was clear up to 8 miles.  (AR04 V, Agency Ex. 12; AR04 IV, Tr. at 35.)

At approximately 21:05, Conning Officer Toomey informed Commander Diaz of a radar contact up to one nautical mile inside RGA1.  (AR04 V, Agency Ex. 19; AR04 III, Tr. at 36.)  Commander Diaz personally verified the radar contact using the USCGC SPENCER's bridge radar, and began tracking it.  The Combat Information Center[9] ("CIC") assigned contact number 8174[10] to the radar contact.  (AR04 V, Agency Ex. 19; AR04 III, Tr. at 37.)  At 21:30, the lookout reported a white light out on the horizon.  (AR04 III, Tr. 170-71.)  The USCGC SPENCER did not, however, take a position fix of the contact at that time.  (JSF, AR04 II, Tab 89, ¶ 14.)  As the USCGC SPENCER approached the light, other crew members were using binoculars and "big eyes,"[11] and visually

---

[9]  The administrative record conflicts as to which instrument, of the Command Display and Control (COMDAC) system or the Combat Information Center (CIC), made the initial designation of the track number.  (*Compare* AR04 III, Tr. at 46 *and* AR04 V, Agency Ex. 19.)  ALJ Devine found that it was the latter.  (AR10 IV, Tab 57, p. 10 ¶ 23.)

[10]  Agency Exhibits 19 and 22 mistakenly identify the track number as 8147 instead of 8174.  This error was corrected by the NOAA.  (AR04 III, Tr. at 105.)

[11]  Big eyes are "oversized pairs of binoculars" that allow one to see at "fairly long distances."  (AR04 III, Tr. at 39.)

observed green over white lights, which indicate a vessel traveling at night.[12]  (*Id*. at 38-39, 171.)  Meanwhile, Commander Diaz directed Conning Officer Toomey to have Quartermaster Coppola plot on a chart the exact location of the radar contact. (AR04 V, Agency Ex. 19; AR04 III, Tr. at 43.)  For each interval, Quartermaster Coppola was required to record the following data on the contact log: the USCGC SPENCER's own position at sea using both its LORAN navigational system and its DGPS, which specifies the vessel's location in longitude and latitude values; the radar range and bearing to the radar target; and the course and speed of the target determined by the Command Display and Control ("COMDAC") system.  (AR04 V, Agency Ex. 14; AR04 III, Tr. at 43-47.)  Quartermaster Coppola[13] used these data to plot the positions of radar contact 8174 and concluded that, at approximately 21:40, it was inside RGA1.  (AR04 V, Agency Ex. 14;

---

[12]  This light configuration - green over white - is required for vessels trawling at night by U.S. Coast Guard Navigational Rules, International - Inland.  *See* COMDTINST M16672.2D. Rule 26(b) ("A vessel when engaged in trawling, . . . . shall exhibit (i) two all-round lights in a vertical line, the upper being green and the lower white, or a shape consisting of two cones with their apexes together in a vertical line one above the other.").

[13]  During the September 23, 2008 Supplementary Hearing, it was noted that Exhibit 14 had not been signed by Quartermaster Coppola, but was signed by Commander Diaz and Michael Walsh, a law enforcement officer.  (AR10 VII, Tab 67, Tr. at 53-54.) Nevertheless, Quartermaster Coppola testified that he was the person who prepared the log identified as Exhibit 14.  (AR04 III, Tr. at 203.)

AR04 III, Tr. at 43, 62, 203.)  According to Commander Diaz, the radar target was positioned at that time approximately seven-tenths of one mile, or 1,400 yards, inside RGA1.  (AR04 V, Agency Ex. 16; AR04 III, Tr. at 61.)  While Quartermaster Coppola recorded the radar data, other crew members used an alidade[14] to correlate the visual lights with the location of the radar target by determining the bearing of the lights.  (AR04 III, Tr. at 42, 193-94; AR10 IV, Tab 57, p. 10 ¶ 26.)  The crew of the USCGC SPENCER testified that they did not observe any other radar contacts or vessels in the area during this time period.  (AR04 III, Tr. at 42, 68, 173, 184, 205.)

Shortly thereafter, but still before 21:49, Conning Officer Toomey notified the Captain of the contact inside RGA1 and the USCGC SPENCER altered its course to intercept radar contact 8174 at a high rate of speed.  (AR04 V, Agency Ex. 16, 19, 37; AR04 V, Respondents Ex. 1; AR04 III, Tr. at 62-63.)  As the USCGC SPENCER approached the F/V SETTLER on its starboard side, the crew of the USCGC SPENCER continued to record the range and bearings to verify that the target vessel was radar contact 8174.  (AR04 III, Tr. at 64-65.)  In total, radar contact 8174 was tracked four

---

[14]  An alidade is defined as "a telescope mounted on a compass repeater and used as part of a ship's navigational equipment for taking bearings."  *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY at 53 (1986).

times, at 21:40,[15] 21:47,[16] 21:52,[17] and 21:58,[18] inside RGA1

traveling southwest at a speed estimated between approximately

two and five knots.[19]  (AR04 V, Agency Ex. 14, 16, 29; AR04 III,

Tr. at 113, 268.)  For each plot, Commander Diaz verified the

approximate position of the contact visually and on the radar

screen.  (AR04 IV, Tr. at 864.)  Frontier Fishing disputes that

these four plots indicate the position of the F/V SETTLER.  The

USCGC SPENCER took three other radar plots of the target vessel

at 22:08,[20] 22:19 and 22:24, all of which were outside RGA1.

(AR04 V, Agency Ex. 14.)  Frontier Fishing admits that these last

---

[15]  At 21:40, the radar target was plotted at a range of
9,700 yards and a bearing of 44° true identified as fix A1 on
Agency Exhibit 16.  (AR04 V, Agency Ex. 14, 16.)

[16]  At 21:47, the radar target was plotted at a range of
7,600 yards and a bearing of 36° true identified as fix A2 on
Agency Exhibit 16.  (AR04 V, Agency Ex. 14, 16.)

[17]  At 21:52, the radar target was plotted at a range of
6,000 yards and a bearing of 33° true identified as fix A3 on
Agency Exhibit 16.  (AR04 V, Agency Ex. 14, 16.)

[18]  At 21:58, the radar target was plotted at a range of
2,600 yards and a bearing of 61° true identified as fix A4 on
Agency Exhibit 16.  (AR04 V, Agency Ex. 14, 16.)

[19]  The USCGC SPENCER did not therefore maintain a constant
radar track on contact 8174 during the course of the evening of
the alleged violation, but rather established discrete radar
fixes.  (AR04 V, Agency Ex. 14.)  These radar fixes were obtained
from the COMDAC system.  (AR04 IV, Tr. at 759.)

[20]  At 22:08, the radar target was plotted at a range of 320
yards and a bearing of 244° true identified as fix A5 on Agency
Exhibit 16.  (AR04 V, Agency Ex. 14, 16.)

three plots were the F/V SETTLER.  (AR04, Report of Pr. Gerard Ouellette, Agency Ex. 41, p. 1.)

At approximately 22:00, Commander Diaz observed that the target vessel was within approximately 1,000 yards on the starboard side of the USCGS SPENCER.  (AR04 V, Agency Ex. 19; AR04 III, Tr. at 70-73, 150.)  At that time, Commander Diaz and the lookout visually observed that the vessel was a stern trawler with its gear placed in the water.  (AR04 III, Tr. 70-73.)  The USCGC SPENCER activated its law enforcement lights, and initiated a 149-degree turn "around" the target vessel at 22:01.  (AR04 V, Agency Ex. 37; AR04 III-IV, Tr. at 76, 595, 642; AR10 VII, Tab 67, Tr. at 41.)  During the turn, the F/V SETTLER remained on the starboard side of the USCGC SPENCER.  (AR10 VII, Tab 67, Tr. at 45-46, 56.)  Commander Diaz stated that, after having completed its turn, the USCGC SPENCER ended on the port quarter of the F/V SETTLER and then paralleled it for several minutes.  (AR04 IV, Tr. at 592; AR10 VII, Tab 67, Tr. at 60.)

Commander Diaz used a VHF-FM radio to hail the fishing vessel, which identified itself as the F/V SETTLER at approximately 22:05.  (AR04 V, Agency Ex. 19, 20, 22; AR04 III-IV, Tr. at 82-83, 592.)  The USCGC SPENCER intercepted the F/V SETTLER just outside of RGA1 at 22:08.[21]  (AR04 V, Agency Ex. 16;

---

[21]  The CIC logs indicate, however, that the USCGC SPENCER "intercepted" the F/V SETTLER at 22:00 inside RGA1.  (AR04 V, Respondents Ex. 3, p. 4.)

AR04 III, Tr. at 73.)  From the first visual contact, at 21:40, through interception of the F/V SETTLER, the USCGC SPENCER maintained continuous visual and radar contact with radar contact 8174.  (AR04 IV, Tr. at 864.)  The crew of the USCGC SPENCER eventually boarded the F/V SETTLER, whose gear was still in the water.  (AR04 V, Agency Ex. 26, 27; AR04 III, Tr. at 231-33.)  Boarding Officer Richard Chicoine interviewed Captain Valente and his crew.  (AR04 V, Agency Ex. 26.)  During this interview, Captain Valente stated that the F/V SETTLER started its trawl at 21:30.  (*Id.*; AR04 III, Tr. at 236-37.)  In addition, Boarding Officer Chicoine looked at the F/V SETTLER's plotter, which he observed contained a waypoint outside of RGA1.  (AR04 V, Agency Ex. 26; AR04 III, Tr. at 251-52.)

## B.   *The Procedural History*

On October 16, 1997, the USCGC SPENCER issued the F/V SETTLER and its Captain a joint and several written citation for fishing with mobile gear in RGA1 in violation of the Magnuson-Stevens Act and its underlying regulation, 50 C.F.R. § 648.14(a)(98).  Over two years later, on February 28, 2000, NOAA issued Frontier Fishing and Captain Valente a Notice of Violation and Assessment ("NOVA") and a Notice of Permit Sanction ("NOPS") assessing a joint and several civil fine of $10,000, a 60-day suspension of Captain Valente's Commercial Operating Permit and a 30-day suspension of Frontier Fishing's Northeast Multispecies Days-at-Sea Permit.  (AR04 I, Tab 1.)  Frontier Fishing's permit

suspension was later amended to apply to its Northeast Scallop
Days-at-Sea Permit instead of its Northeast Multispecies Days-at-
Sea Permit.  (AR04 I, Tab 24.)

An evidentiary hearing was held on August 14 and 15, 2001,
and November 19 and 20, 2002 before United States Coast Guard
Administrative Law Judge ("ALJ") Parlen McKenna.  (AR04 III-IV.)
On August 5, 2003, ALJ McKenna issued the Initial Decision and
Order affirming NOAA's finding of a violation by Respondents.[22]
(AR04 II, Tab 106, p. 8 at ¶ 10.)  ALJ McKenna ordered a 30-day
permit suspension for both Captain Valente and Frontier Fishing
but increased the joint and several civil fine to $35,000.  (*Id.*
at 22.)  Frontier Fishing brought a *first* petition for
discretionary review pursuant to 15 C.F.R. § 904.273, which was
denied on May 3, 2004.  (AR04 II, Tab 111, 114.)

On June 2, 2004, Frontier Fishing initiated *Frontier I* in
this court against the Defendants seeking review pursuant to 16
C.F.R. § 1858(b) on the ground that the radar contact identified
in RGA1 could not have been the F/V SETTLER and requesting that
the administrative record be supplemented.  On March 31, 2006, I
issued a Memorandum and Order in which I concluded that ALJ
McKenna's findings - that the NOAA properly correlated visual and

---

[22]  As discussed above, *supra* Note 6, Captain Valente is not
a party to this appeal but was a party before the NOAA.
Accordingly, the term "Respondents" used in this Memorandum and
Order refers to both Captain Valente and Frontier Fishing.

radar readings of the F/V SETTLER's position and that the radar
targets in RGA1 were the F/V SETTLER - were supported by
substantial evidence. *Frontier I*, 429 F. Supp. 2d at 328-30.
Nevertheless, I concluded that ALJ McKenna's finding that the F/V
SETTLER moved from the radar target identified as A4 to a visual
range less than 1,000 yards from the USCGC SPENCER in
approximately two minutes was not supported by substantial
evidence.  I therefore remanded the matter for "a de novo review
based on the entire record, including such further development of
the record, . . . as appears advisable to the ALJ." *Id.* at 329-
35.  Finally, I denied[23] Frontier Fishing's motion to supplement
the administrative record with a set of materials, including a
one-page document.[24] I also denied its alternative request for
further discovery to determine whether some CIC radar logs had
not been produced and to establish the Agency's understanding of
the one-page document in question. *Id.* at 323-27.

On remand, Frontier Fishing filed another motion for

---

[23]  I noted in the March 31, 2006 Memorandum and Order that
I denied Frontier Fishing's motion to supplement the record
"without prejudice to such development of the record as appears
advisable to the ALJ" upon remand.  *Id.* at 324 n.8.

[24]  This one-page document, produced by the Agency,
consisted of a single line of handwritten entries on a form that
resembles a radar tracking log form of the type used by the Coast
Guard.  *Id.* at 324.  The chart bore the date October 16, 1997,
the time 10:19, the track number 8174, the remarks "SETTLER Pts,"
and navigational data, however it did not identify the author or
the vessel on which the author was stationed.  *Id.*

discovery on the same ground, which ALJ McKenna denied on
February 2, 2007.  (AR10 I, Tab 8.)  On October 4, 2007, ALJ
McKenna issued a Supplemental Initial Decision and Order of
Remand reaffirming the finding of a violation.  (AR10 I, Tab 20.)
Frontier Fishing filed a *second* petition for discretionary
review. (AR10 II, Tab 22.)  On February 28, 2008, NOAA's
Administrator granted Frontier Fishing's petition and directed a
second remand for a de novo review by a different ALJ on the
ground that ALJ McKenna's review was narrower than that ordered
in my March 26, 2006 Memorandum and Order.  (AR10 II, Tab 24.)

On March 31, 2008, the matter was reassigned to ALJ Michael
Devine for a de novo review in accordance with my instructions.
(AR10 III, Tab 25.)  Frontier Fishing again requested further
discovery but was informed that the Agency was unable to provide
some of the documents sought.  (AR10 IV, Tabs 39, 42.)  On August
21, 2008, ALJ Devine ruled that Frontier Fishing's motion for
discovery had been satisfied.  (AR10 IV, Tab 44.)

A supplementary hearing was held on September 23, 2008.
(AR10 VII, Tab 67.)  During this hearing, ALJ Devine refused to
allow the disputed one-page document into evidence.  *See supra,*
Note 24.  On February 26, 2009, ALJ Devine issued a Supplemental
Decision and Order after remand affirming NOAA's finding of a
violation on the following ground:

> The Agency has established by a preponderance of reliable
> and credible evidence that Respondents Valente and
> Frontier violated the Magnuson-Stevens Act and its

> underlying regulation codified at 50 C.F.R. §
> 648.14(a)(98) by unlawfully fishing in Restricted Gear
> Area I with trawl gear at approximately 2140 hours on the
>
> evening of October 16, 1997 when the area was closed to
> mobile gear.

(AR10 VII, Tab 57, p. 13 at ¶ 13.)  ALJ Devine imposed a civil

penalty in the amount of $10,000 and a 30-day suspension of both

Valente's and Frontier Fishing's permits.  (*Id.* at 41.)

Frontier Fishing sought a *third* discretionary review, which

was granted in part on July 17, 2009.  (AR10 VI, Tab 62.)  The

discretionary review was limited to two issues:

> [1] Whether the ALJ clearly erred in finding that the
> 21:58 plot taken by the Coast Guard of the *Settler*'s
> position on October 16, 1997, was reasonably accurate,
> and if so, what impact does the error have on the ALJ's
> finding with respect to the reliability of the Coast
> Guard plot taken at 21:40? . . .
>
> [2] Whether the permit sanction imposed by the ALJ
> against Frontier Fishing was appropriate and supported by
> substantial evidence in the record?

(AR10 VI, Tab 62, p. 2.)  On January 15, 2010, NOAA's

Administrator affirmed ALJ Devine's conclusion that Frontier

Fishing was liable for fishing illegally in RGA1 on October 16,

1997, concluding that:

> The fact that the 21:58 plot, taken when the vessels were
> closing in on each other in high speed, may not have been
> accurate does not, under these circumstances, undermine
> the reliability of the 21:40 plot or the other plots.
> Therefore, the weight of the evidence supports the
> conclusion that even if there was an error made in the
> 21:58 plot, the 21:40 plot showing the *Settler* within
> RGA1 was reliable.

(AR10 VI, Tab 66, p. 9.)  NOAA's Administrator affirmed the

14

$10,000 fine but reduced the permit sanction imposed against Frontier Fishing to one-quarter of the days-at-sea in light of new regulations enacted while the resolution of the case was pending.  (*Id.* at 11.)

Frontier Fishing filed the present action on February 2, 2010 against the Defendants, seeking review pursuant to 16 U.S.C. § 1858(b).

## II.  FURTHER DISCOVERY

Frontier Fishing sought further discovery in this court in anticipation that I would remand this matter yet again for further administrative proceedings.  I address this request at the outset because it has an affect on the body of evidence I have considered with respect to the dispositive motions.

## A.  *Prior Discovery History*

The administrative record is replete with discovery requests.  Some of the requests were presented during judicial review of the administrative action.  In addition to seeking review of the NOAA Administrator's finding of violation in 2006, Frontier Fishing also moved to supplement the administrative record with a set of materials, including a one-page document produced by the Agency as part of the CIC logs, which consisted of a single line of handwritten entries on a form that resembled a radar tracking log form of the type used by the United States Coast Guard ("Frontier Exhibit 15").  As part of my March 31,

2006 ruling, I denied Frontier Fishing's motion, on the following

ground:

> [T]here is simply no evidence of bad faith on the part of
> NOAA and the voluminous Administrative Record consisting
> of correspondence between the parties, NOAA's initial and
> final order, and the proceedings before the ALJ, which
> includes the ALJ's comprehensive 57-page decision, the
> briefs, the transcript, and exhibits, is more than
> sufficient to allow effective judicial review. Simply
> raising the question of whether NOAA improperly ignored
> some evidence in the possession of both parties prior to
> the start of a formal administrative adjudication, but
> not admitted as evidence in the ALJ hearing, is not a
> ground for supplementing the record.
>
> . . . .
>
> Frontier Fishing was given ample opportunity to conduct
> discovery in the administrative proceedings and has moved
> for summary judgment even without the information it
> would seek on discovery.  The Defendants have provided
> all of the information they relied on in making their
> determination and the ALJ determined that information was
> sufficient.  Furthermore, there is nothing before me
> suggesting that the Agency did not understand its duty to
> produce any potentially exculpatory evidence.

*Id.* at 325-26.

On remand, Frontier Fishing filed another motion seeking the

production of several documents, including all training and

operating manuals for the radar and the COMDAC system in

operation on board the USCGC SPENCER during the night of the

alleged violation, a complete list of all personnel on board the

USCGC SPENCER and all records of targets tracked by the COMDAC

system during that night.  (AR10 I, Tab 5.)  This motion was

denied by ALJ McKenna on February 2, 2007.  (AR10 I, Tab 8.)  The

rationale for the denial of Frontier Fishing's discovery request

16

was stated as follows:

> [T]here is no basis to grant Frontier's discovery
> request. This is especially true given the fact that
> Frontier's former counsel received [Frontier Exhibit 15]
> on August 10, 2001 in advance of the administrative
> hearing. Frontier could have introduced the entire CIC
> logs, including [Frontier Exhibit 15], into the
> administrative record if desired on August 14 and 15,
> 2001 and on November 19 and 20, 2002. But, Frontier, for
> whatever reason, elected not to do so. Thus, it cannot
> be said that the Agency acted in bad faith.
>
> Most importantly, Frontier has had access to the document
> that serves as the foundation of its discovery request
> since August 2001. The district court noted that Frontier
> was given ample opportunity to conduct discovery in the
> underlying administrative proceeding, and NOAA provided
> Frontier with all of the information that the Agency
> relied upon in finding a violation. Therefore, the fact
> that Frontier's former counsel misplaced or possibly
> erred in failing to request further discovery; and/or
> mistakenly failed to introduce [Frontier Exhibit 15] into
> the administrative record, does not serve as an adequate
> basis to grant Respondent's motion for discovery.

(*Id*. at 4 (internal citation omitted).)

Following the reassignment of the present matter to ALJ Devine, Frontier Fishing again sought permission to conduct further discovery,[25] including any written and testimonial discovery into the COMDAC system and into the actions and records of the CIC, the cover sheet transmitting Frontier Exhibit 15 to the Agency on August 10, 2001, and a list of personnel on board the USCGC SPENCER during the night of the alleged violation.

---

[25] In the interim, Frontier Fishing also filed a Freedom of Information Act (FOIA) request with the United States Coast Guard similar to that sought in the administrative proceedings. (AR10 IV, Tab 42, Ex. A & B.)

(AR10 IV, Tab 39.)  With respect to the COMDAC and CIC logs, the Agency's response was that the United States Coast Guard and the NOAA had "already provided Respondent with all of the COMDAC and CIC information in their possession that Respondent ha[d] requested" and were therefore "unable to provide any additional information regarding either the COMDAC system or the records of the CIC."  (AR10 IV, Tab 42, p. 2.)  As to the cover sheet transmitting Frontier Exhibit 15, the NOAA declared that it had "searched its files and [could] not locate the information requested."  (*Id.*)  Finally, with respect to the list of personnel, the Agency alleged that it was "checking with the Coast Guard to find a list of all personnel assigned to the CIC on the USCGC Spencer on the night of [the incident], and w[ould] provide Respondent with the information, *if any*, obtained from this search."  (*Id.* at 2-3 (emphasis added).)  Finding that the Agency's response had "provided sufficient additional discovery," ALJ Devine denied Frontier Fishing's motion for discovery on August 21, 2008.  (AR10 IV, Tab 44.)

A supplementary hearing was held on September 23, 2008. (AR10 VII, Tab 67.)  During that hearing, Frontier Fishing offered three exhibits: Agency Exhibit 14, Frontier Exhibit 15, and Frontier Exhibit 15a, which included an affidavit of Frontier Fishing's expert witness, Professor Gerard Ouellette, that discusses the significance of Frontier Exhibit 15.  Frontier Fishing presented argument as to why Exhibits 15 and 15A should

18

be admitted into evidence. (*Id.* at 107-23.)   ALJ Devine denied

Frontier Fishing's request on the ground that "the relevance of

[Frontier Exhibits 15 and 15a] ha[d] not been established."

(AR10 IV, Tab 57, p. 15.)   ALJ Devine specifically held,

> Although Respondent Frontier can create theories as to
> how this material would fit into their defense, the same
> concerns identified in the district court decision result
> in a finding that the documents are not reliable or
> relevant evidence of anything at this point. Among the
> identified concerns is the fact that contrary to Coast
> Guard protocol, the log is not signed and does not
> contain the standard line drawn over the unused portion
> of the page. Additionally, there is no explanation that
> would allow for the time of 10:19 to be considered as
> 10:19 PM, since the Coast Guard uses 24 hour military
> time and the incident in question would have been
> recorded as 2119 not 1019.
>
> While Respondent Frontier's current counsel might have
> presented the original case in a different manner, the
> previous counsel also provided a vigorous defense. . . .
> It is clear that there was a full and fair opportunity to
> obtain discovery and present evidence when the case was
> originally heard in 2001 and 2002. Therefore, I do not
> find Respondent Frontier's current arguments persuasive
> and complaints regarding earlier discovery is
> unwarranted. I find the document presented as Respondent
> Exhibit 15 is not relevant and was not admitted into
> evidence for this matter. Exhibit 15a is an affidavit of
> Professor Ouellette and presents analysis and assumptions
> based on Exhibit 15. Since Respondent Exhibit 15a is not
> relevant unless Exhibit 15 is admitted into evidence,
> Exhibit 15a is also rejected for lack of relevance and
> was not admitted into evidence.

(*Id.* at 15-16.)   As part of this ruling, ALJ Devine affirmed the

NOAA's finding of a violation. (*Id.* at 13.)   On further

discretionary review, the NOAA Administrator affirmed ALJ

Devine's conclusion. (AR10 VI, Tab 66, p. 9.)

19

**B.    Standard of Review Applicable to Discovery before the NOAA**

It is axiomatic that "[t]he extent of discovery to which a party to an administrative proceeding is entitled is primarily determined by the particular agency." *Pac. Gas & Elec. Co.* v. *FERC*, 746 F.2d 1383, 1387 (9th Cir. 1984).  Pursuant to the NOAA regulations, the Preliminary Position on Issues and Procedures ("PPIP") will "normally obviate the need for further discovery." 15 C.F.R. § 904.240(a).  The PPIP includes "[a] factual summary of the case; a summary of all factual and legal issues in dispute; a list of all defenses that will be asserted, together with a summary of all factual and legal bases supporting each defense; a list of all potential witnesses, together with a summary of their anticipated testimony; and a list of all potential exhibits."  15 C.F.R. § 904.240(a)(1).

Upon written motion by a party, the ALJ "may allow additional discovery only upon a showing of relevance, need, and reasonable scope of the evidence sought, by one or more of the following methods: Deposition upon oral examination or written questions, written interrogatories, production of documents or things for inspection and other purposes, and requests for admission."  15 C.F.R. § 904.240(b).  The scope of permissible discovery encompasses "any matter, not privileged, that is relevant to the allegations of the charging document, to the proposed relief, or to the defenses of any respondent, or that

20

appears reasonably calculated to lead to the discovery of admissible evidence." 15 C.F.R. § 904.240(e)(1).

## C. Application of Standard to Frontier Fishing's Discovery Requests

Frontier Fishing seeks the production of several documents and depositions from crew members on board the USCGC SPENCER during the night of the alleged violation. The requested documents include, among others, all records prepared and maintained on the USCGC SPENCER during the night of the alleged violation, the fax cover sheet transmitting Frontier Exhibit 15 to the Agency, and all records regarding the ability of the COMDAC system to maintain a track on target.

The crux of the Frontier Fishing argument in support of its discovery motion is that Exhibit 15 suggests the existence of exculpatory evidence demonstrating that radar contact 8174 identified in RGA1 on October 16, 1997 was not the F/V SETTLER. The mere fact that Exhibit 15 places radar contact 8174 at a different position relative to the USCGC SPENCER is insufficient to warrant further discovery. On remand, both ALJs McKenna and Devine carefully weighed the relevance and the need for additional discovery pertaining to Exhibit 15. In doing so, ALJ McKenna noted that, while Frontier Fishing had received Exhibit 15 on August 10, 2001, it had elected not to offer that document in evidence at the administrative hearings of August 14 and 15, 2001 and November 19 and 20, 2002. (AR10 I, Tab 8, p. 4.) ALJ

Devine identified certain concerns associated with Exhibit 15.
Although it bears the date October 16, 1997, the time 10:19, the
same track number as the radar contact located in RGA1, the
remarks "SETTLER Pts," and navigational data, the document does
not identify the author or the vessel, if any, on which the
author was stationed; is unsigned; and does not contain the
standard line drawn over the unused portion of the page, which is
designed to ensure that no additions are made to the document.
(AR10 IV, Tab 57, p. 15.)  Additionally, Frontier Fishing fails
to provide any persuasive explanation that would allow for the
time of 10:19 to be considered as 10:19 PM, given that the United
States Coast Guard uses military time and the incident in
question would have been recorded as 21:19 not 10:19.  (*Id.*)

Even assuming, for the sake of argument, the admissibility
and relevance of Exhibit 15 could be established, remand for
further discovery would prove futile and duplicative.  Frontier
Fishing presented a series of interrogatories as a way to obtain
further discovery.  One of the interrogatories concerns the
identity of the person who transmitted the CIC logs, including
Exhibit 15, to the Agency.  In its opposition, the NOAA responded
that it was impossible for either NOAA or the Coast Guard to
determine who sent this material to the Agency.  It further
indicated that NOAA and the Coast Guard had neither information
concerning this request nor the means of finding out this
information.  Frontier Fishing also inquired about the identity

22

of the CIC crew members who prepared Exhibit 15 and tracked the radar contact during the night of the alleged violation.  The Agency's response was that both the NOAA and the Coast Guard had conducted a thorough search for this information but had been unable to identify the individual responsible for preparing this document.  The Agency also stated that it had produced all the log books and records pertaining to this case.  In the same vein, the Coast Guard declared that it "no longer ha[d] any items pertaining to this case in their possession."

Another argument raised by Frontier Fishing in further support of its discovery motion is that the NOAA's constantly changing interpretation of the facts - most recently its abandonment of one of the four radar contacts that it previously asserted was the F/V SETTLER - raises concerns about the accuracy of the plots attributed to the F/V SETTLER.  Specifically, Frontier Fishing seeks further discovery regarding a one-page record of the electronic tracking[26] of the radar contact detected within RGA1 during the evening of the alleged violation.  That document, which was introduced into evidence, was signed by United States Coast Guard Lieutenant Commander Charley Diaz and countersigned by the Underway Officer on Deck, Ensign Toomey.

---

[26] Agency Exhibit 14 includes the radar contact's position at sea using both the Digital Global Positioning System, which specifies the vessel's location in longitude and latitude values; the LORAN navigational system; the radar range and bearing to the radar target; and the course and speed of the target determined by the COMDAC system.

One of the concerns raised by Frontier Fishing relates to procedure used to report data on Agency Exhibit 14.[27]  Another concern pertains to the ability of the COMDAC system to maintain a track on a single vessel without breaking contact. Surprisingly, however, Frontier Fishing had not until this stage in the proceedings challenged the authenticity of Agency Exhibit 14.  In any event, its request for the production of all documentation pertaining to that exhibit must be denied.

The Agency has consistently represented throughout these proceedings that it had produced all the documentation on the radar system used on board the USCGC SPENCER during the night of the incident and there is no basis for rejecting that representation.  Additionally, Frontier Fishing has had an adequate opportunity to examine witnesses during the administrative hearings regarding the functionality of the radar systems on board the USCGC SPENCER that night.  (AR04 III, Tab 115, Tr. 187-88, 196-97.)  Accordingly, I conclude that any further discovery would prove futile and duplicative.

Lastly, Frontier Fishing alleges that the NOAA indicated that it would furnish a list of crew members on board the USCGC SPENCER during the night of the incident, but failed to do so

---

[27] Frontier Fishing alleges that the Agency personnel initially testified that Agency Exhibit 14 was created by various crew members calling out information from different navigational instruments, but that Officer Toomey later admitted that he had created that document from the COMDAC system.

following ALJ Devine's denial of further discovery.  Frontier
Fishing is mistaken in this allegation because the NOAA only
stated that it would provide that list if its search for this
information yielded any result.  (AR10 IV, Tab 42, pp. 2-3.)
Apparently, it has not.

### III. STANDARD OF REVIEW

The traditional standard of review for summary judgment does
not formally apply in this case.[28]  *See Frontier I*, 429 F. Supp.
2d at 322.  Instead, under the Magnuson-Stevens Act, a court must
review the agency's findings to determine if they are "supported
by substantial evidence."[29]  16 U.S.C. § 1858(b); 5 U.S.C.
§706(2); *Penobscot Air Servs., Ltd. v. F.A.A.*, 164 F.3d 713, 718
(1st Cir. 1999).  "Substantial evidence is more than a scintilla,
and must do more than create a suspicion of the existence of the
fact to be established. It means such relevant evidence as a
reasonable mind might accept as adequate to support a
conclusion."  *R & B Transp., LLC* v. *U.S. Dep't. of Labor, Admin.*

---

[28]  Frontier Fishing filed a Motion and Memorandum for
Summary Judgment on September 21, 2010.  For its part, Defendants
filed a Motion and Memorandum to Affirm the Decision of the NOAA
and in Opposition to Frontier Fishing's Motion for Summary
Judgment on November 15, 2010.  (Dkt Nos. 13-14.)

[29]  Frontier Fishing again asserts that NOAA's findings and
order must be set aside because they are "arbitrary and
capricious, not supported by substantial evidence and otherwise
contrary to law."  However, as discussed in *Frontier I*, "16
U.S.C. § 1858(b) specifically directs that I apply the
substantial evidence standard in reviewing the Agency's findings
and order."  429 F. Supp. 2d at 322 n.7.

*Review Bd.*, 618 F.3d 37, 44 (1st Cir. 2010) (quoting *BSP Trans, Inc.* v. *U.S. Dep't of Labor*, 160 F.3d 38, 47 (1st Cir. 1998)). "In conducting this tamisage, the ALJ's credibility determinations are entitled to great deference." *Astralis Condominium Ass'n* v. *Sec'y, U.S. Dep't. of Housing and Urban Dev.*, 620 F.3d 62, 66 (1st Cir. 2010).

When reviewing an agency's decision, "[t]he reviewing court must take into account contradictory evidence in the record." *Penobscot,* 164 F.3d at 718.  But "[t]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Hosp. Cristo Redentor, Inc.* v. *N.L.R.B.*, 488 F.3d 513, 519 (1st Cir. 2007) (quoting *N.L.R.B.* v. *Hosp. San Pablo, Inc.*, 207 F.3d 67, 70 (1st Cir. 2000)).  Rather, "[t]he agency's findings must [only] be set aside when the record . . . clearly precludes the [agency's] decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence or both." *Penobscot,* 164 F.3d at 718 (quoting *Universal Camera Corp.* v. *N.L.R.B.*, 340 U.S. 474, 490 (1951)) (internal quotation marks omitted and third alteration in original).

## IV.   ANALYSIS[30]

In order to prevail on the charges instituted against the Respondents, NOAA must prove the violations alleged in the NOPS and NOVA by a preponderance of the evidence.  (AR10 IV, Tab 57, p. 17 citing 5 U.S.C. 556(d).)  *See also Steadman* v. *S.E.C.*, 450 U.S. 91, 100-03 (1981) (finding that the term "supported by and in accordance with reliable, probative and substantial evidence" refers to the "preponderance of the evidence" standard of proof). The burden of producing evidence to rebut or discredit NOAA's evidence only shifts to Respondents once NOAA has proven the allegation contained in the NOPS and NOVA by a preponderance of reliable, probative, substantial and credible evidence.  (AR10 IV, Tab 57, p. 17 citing *In the Matter of: Cuong Vo*, 2001 WL 1085351 (NOAA Aug. 17, 2001).)

Applying this standard, ALJ Devine found that NOAA had established a *prima facie* case based on the following findings of fact:

(1)   RGA1 was closed at the time of the violation. (AR04 Agency Ex. 8, 16; JSF, AR04 II, Tab 89, ¶ 9.)

(2)   The USCGC SPENCER recorded four position fixes of radar contact 8174 in RGA1 between 21:40 and 21:58 on October 16, 1997.  (AR 04, Agency Ex. 14, 16.)

---

[30]   Both ALJ Devine and the NOAA Administrator have ruled on the *appropriateness* of the sanctions imposed (AR10 IV, Tab 57, pp. 33-40; AR10 VI, Tab 66, pp. 9-11), but Frontier Fishing has not raised any argument on this issue, other than denying liability.  Accordingly, I only address the issue of liability in this Memorandum and Order.

(3)   There was no other radar or contact with vessels in
      the area at the time. (AR04 III-IV, Tr. at 42, 68,
      174, 184, 205, 585, 761, 863-64.)

(4)   The radar fixes were corroborated by Commander Diaz
      and his crew who visually observed a vessel with
      green over white lights. (AR04 III, Tr. at 38-39,
      170-71.)

(5)   The lights being observed, later identified as
      those of the F/V SETTLER, corresponded with radar
      contact 8174. (AR04 V, Agency Ex. 19, 20.)

(6)   The parties stipulated that the F/V SETTLER had its
      trawl net in the water and was engaged in fishing
      between 21:30 and 22:08 on October 16, 1997. (JSF,
      AR04 II, Tab 89, ¶ 10.)

(7)   The parties also stipulated that the 22:08 plot,
      barely outside of RGA1, was the F/V SETTLER. (AR04
      IV, Tr. at 502, 533-34.)

(9)   Respondents' experts stated that the navigation
      system on the USCGC SPENCER was functioning
      properly at the time of the alleged violation.
      (AR04 III-IV, Tr. at 381, 638-39.)

(9)   Respondents' expert also stated that the USCGC
      reliably plotted "something" inside RGA1. (*Id*.)

(*See* AR10 IV, Tab. 57.)

Acknowledging that the NOAA introduced sufficient evidence
to establish a *prima facie* case of a fishing violation, Frontier
Fishing presented rebuttal evidence to show that the F/V SETTLER
could not have been radar contact 8174.

*First*, Frontier Fishing argues that if the F/V SETTLER was
not at the 21:58 plot, there must have been another vessel or
high flyer in the area during the relevant time period, thereby

reasserting the so-called "phantom theory."[31]

*Second* and more importantly, Frontier Fishing again raises the "impossibility theory" contending it would have been impossible for the F/V SETTLER to have traveled from radar contact A4 at 21:58 to the locality where the it was sighted by Commander Diaz at 22:00.  I will discuss each argument in turn.

## A.   *The Phantom Theory*

Frontier argues that the crew of the USCGC SPENCER confused the F/V SETTLER with some other vessel or a high flyer during the evening of October 16, 1997.  According to the "phantom theory," the phantom vessel was picked up by the USCGC SPENCER's radar but the F/V SETTLER was not, possibly because of "radar clutter" caused by a concentration of high flyers in the area.  This theory is not new.  Frontier has consistently proposed it since the beginning of the administrative proceedings to reconcile the F/V SETTLER's course that night with the observations made by the crew of the USCGC SPENCER.

ALJ Devine concluded that "Respondents' argument [that] the radar contact was another vessel or 'high flyers' is not persuasive." (AR IV, Tab 57, p. 24.)  The NOAA Administrator affirmed this conclusion.  (AR10 VI, Tab 66, p. 8.)  The USCGC

---

[31]   While Frontier Fishing does not fully address this argument at this stage, it contends summarily that "[i]f SETTLER was not, for example, contact 8174 at 21:58, then another vessel was."  (Frontier Fishing SJ Mem. p. 10.)

SPENCER's radar was set to a 12-mile range that night.  (AR04
III, Tr. at 37.)   The evidence contained in the administrative
record shows no other vessel or high flyer in the area that could
be responsible for the radar contact.  (AR10 IV, Tab 57, p. 18;
AR04 III-IV, Tr. at 42, 68, 174, 184, 205, 585, 761, 863-64.)   If
other vessels were in the vicinity, the USCGC SPENCER's crew
would have detected the vessels or high flyers on the radar.
(AR04 IV, Tr. at 658-59, 862-63.)   In fact, Commander Diaz and
Conning Officer Toomey would have been able, based on their
experience, to distinguish between a high flyer and a fishing
vessel from the radar screen.  (*Id.* at 585-86.)   This is
corroborated by the testimony of Captain Valente, who admitted
that he could tell the difference between fixed gear and a
fishing vessel by looking on his radar.  (*Id.* at 566-67.)
Respondents' expert witness, Professor Gerard Ouellette, also
testified that the motion of a vessel makes it distinguishable
from a high flyer.  (*Id.* at 652-53.)   Based on this evidence, ALJ
Devine found that "any implication that radar 'clutter' from the
brilliance of the high flyers obstructed the Coast Guard's view
in the area is speculative and is not supported by reliable and
credible evidence."  (AR10 IV, Tab 57, p. 24; AR04 IV, Tr. at
651-52.)   Likewise, NOAA's Administrator found the Respondents'
theory not persuasive because "[t]hey have advanced no credible
explanation for why radar 'clutter' would interfere with the
*Spencer*'s ability to pick up the *Settler* on radar but would not

30

interfere with its ability to pick up a phantom vessel in the same vicinity." (AR10 VI, Tab 66, pp. 8-9.)

Considering the evidence in the record, I find that ALJ Devine and the NOAA Administrator's conclusion that radar contact 8174 was the F/V SETTLER rather than another vessel or high flyer is supported by substantial evidence. I therefore decline to disturb the conclusion that "there is no credible evidence in the record to support the phantom vessel theory." (*Id*. p. 8.)

**B.   *The Impossibility Theory***

According to the impossibility theory, the F/V SETTLER could not have moved from the radar target's position A4 at 21:58 to where it was observed by Commander Diaz at approximately 22:00. This theory posits that if the F/V SETTLER could not have been radar contact 8174 at 21:58, it also could not have followed the path of radar contacts, and therefore could not have been the radar contact identified at 21:40, 21:47, and 21:52. ALJ Devine found that NOAA did not need to prove that the F/V SETTLER followed the entire plotted course of radar contact 8174, so long as the 21:40 plot was accurate. (AR10 VII, Tab. 67, pp. 27-31.) Frontier Fishing contends that ALJ Devine's conclusion reduces the NOAA's case to "mere speculation," thereby allowing the NOAA selectively to accept or reject the accuracy of the USCGC SPENCER's radar contacts.

In *Frontier I*, I found that ALJ McKenna's rejection of the impossibility theory was "inconsistent with some of the findings

of facts that he accepted." 429 F. Supp. 2d at 330-35.  These

findings included that (1) the F/V SETTLER was within

approximately 1,000 yards of the USCGC SPENCER's starboard side

at 22:00, as observed by Commander Diaz, (2) Commander Diaz

personally saw the F/V SETTLER's lines and cables in the water,

(3) "the USCGC SPENCER passed the vessel rather closely in a

starboard to starboard configuration," (4) the USCGC "SPENCER

carried out a turn to starboard . . . bringing it to a heading of

. . . nearly due south during the one minute interval between

22:00 and 22:01" and (5) after the turn, the USCGC SPENCER came

around and ended up behind the F/V SETTLER "on his port quarter."

*Id*. at 331.  (AR04 II, Tab 106, pp. 5-6, 39, 41, 48.)  Based on

these observations, Professor Ouellette had opined that if the

radar target had moved from A4 at 21:58 to within 1,000 years at

22:00 at an angle, so that Commander Diaz could observe the F/V

SETTLER's trawl nets and the USCGC SPENCER could pass and circle

the fishing vessel, then the target would have had to maintain a

speed in excess of 25 knots.  (AR04 V, Agency Ex. 41, p. 6.)  In

light of the facts accepted by ALJ McKenna and the testimony of

Professor Ouellette, I found that:

> the only way to reconcile the header log and radar data
> with the observations made by Commander Diaz that were
> accepted by the ALJ is *either* to find that the F/V
> SETTLER was not at point A4 at 21:58 *or* that the F/V
> SETTLER traveled at a speed greater than 15 knots to be
> within 1,000 yards of the USCGC SPENCER at 22:00.

*Frontier I*, 429 F. Supp. 2d at 332 (emphasis added).  Considering

that there was no evidence suggesting that the F/V SETTLER could

have traveled at that speed even without its fishing gear deployed, I concluded that ALJ McKenna's rejection of the impossibility theory was "untenable" and could not be supported by substantial evidence. *Id.* at 330-35.[32]

Upon remand, the evidence and arguments presented by the parties were largely the same as presented in the earlier proceedings. After consideration of the administrative record, ALJ Devine concluded that "the basis of the analysis regarding the asserted impossibility defense[] is not sufficiently supported by the facts." (AR10 IV, Tab. 57, p. 25.) Like the NOAA Administrator, in order to determine whether the ALJ's conclusion is supported by substantial evidence, I consider the two following issues:

(1)  Whether the 21:58 plot taken by the Coast Guard of the *Settler*'s position on October 16, 1997 was reasonably accurate; and

(2)  If [not], what impact does any error have on the ALJ's finding with respect to the reliability of the Coast Guard plot taken at 21:40.

(AR10 VI, Tab 62, p. 2.)

---

[32]  In reaching this conclusion, I also found that ALJ McKenna's rejection of the Respondents' Proposed Findings of Fact H-2, H-4, and H-9 was problematic given the assumptions he had adopted. *Frontier I*, 429 F. Supp. 2d at 333-34. In the present case, ALJ Devine has now substituted a response to Respondents' Proposed Findings of Fact H-2, H-4, and H-9 as follows: "NEITHER ACCEPTED NOR REJECTED: The weight of any evidence including testimony during the hearing is to be determined by the court. Some of the evidence may be accepted, some may be rejected and some may be considered immaterial. See Decision and Order." (AR10 IV, Tab. 57, pp. 71-73.)

1.   <u>The Accuracy of the 21:58 Plot</u>

In resolving the specific concern regarding the location of the F/V SETTLER at 21:58 and the location identified by Commander Diaz at 22:00, ALJ Devine relied on the testimony of the Agency's expert, Dr. Benjamin B. Peterson.  (AR10 IV, Tab. 57, pp. 25-26; Report of Dr. Benjamin B. Peterson, Agency Ex. 32, 40.)  ALJ Devine found that, because of the limitations of the charts, the effect of rounding numbers, and human error in preparing the plots, there was a potential of margin error of approximately 200 yards[33] in plotting the F/V SETTLER's position.  (AR10 IV, Tab. 57, pp. 22-23; *see also* Reports of Dr. Benjamin B. Peterson, Agency Ex. 32, 40.)  This was particularly true, according to Dr. Peterson, when the USCGC SPENCER was closing the distance to the F/V SETTLER at high speed. (AR10 IV, Tab. 57, pp. 23, 26; AR04 IV, Tr. at 447-49.)  Nonetheless, ALJ Devine found that the margin of error was "insignificant" and concluded that "[t]he positions plotted by QM1 Coppola were reasonably accurate." (AR10 IV, Tab. 57, p. 23; *see also id.* at 13, ¶ 13.)

---

[33]   To be precise, ALJ Devine found that the error amounted "to approximately a 200-yard difference between the positions calculated by Dr. Peterson using the computer software program and the position manually plotted by QM1 Coppola."  (AR10 IV, Tab. 57, p. 22.)  As a basis for this assertion, ALJ Devine relied on Dr. Peterson's testimony that the difference was about "200 yards."  (AR04 III, Tr. at 280-81.)  The NOAA Administrator considered that the margin of error found by ALJ Devine was "approximately 100-200 yards."  (AR10 VII, Tab. 67, p. 8.)  For purposes of this Memorandum, I will rely on Dr. Peterson's opinion regarding a "200 yards" difference.

At the discretionary review stage, the NOAA's Administrator disagreed, considering that "the ALJ [Devine] may have erred in finding that the position plot taken by the Coast Guard of the *Settler*'s position at 21:58 was accurate." (AR10 VI, Tab 66, p. 8.) In reaching this conclusion, the NOAA's Administrator relied upon the USCGC SPENCER's position as shown by the header log and Commander Diaz' testimony that the F/V SETTLER was on the USCGC SPENCER's starboard side throughout its turn and did not change course or speed during that time. (*Id.*)

Consistent with the NOAA Administrator's conclusion, I find substantial evidence to support the finding that the 21:58 plot is inaccurate because it would have been impossible for the F/V SETTLER to be at that location at 21:58. With regard to the F/V SETTLER's speed, ALJ Devine found that "the F/V SETTLER could have traveled from the 21:47 position to the 22:08 position without exceeding 6 knots." (AR10 VII, Tab. 57, p. 26.) In other words, he relied on the assumption that the target's speed was 5.7 knots as testified by Dr. Peterson. (AR10 VII, Tr. at 32, 40.) Thus, ALJ Devine rejected the theory advanced by Professors David L. Kan and Gerard Ouellette that the speed of the F/V SETTLER would have to exceed 20 knots.[34] (AR04 V, Agency

---

[34]   ALJ Devine also rejected the report and testimony of Respondents' expert witness, Professor Clifford A. Goudey, that the F/V SETTLER's maximum speed was 3.4 to 3.6 knots at full throttle. (AR10 IV, Tab. 57, pp. 28-30; AR04 V, Report of Clifford A. Goudey, Respondents' Ex. 5.) ALJ Devine found that absent certain critical evidence that the vessel's nets were

Ex. 12; AR04 V, Agency Ex. 41, p. 6.)  Rather, he concluded that accepting this theory would impermissibly require NOAA to prove that the F/V SETTLER followed the exact path between the radar plots and was located at an exact mark of 1,000 yards when it passed the USCGC SPENCER.  (AR10 IV, Tab. 57, pp. 26-27.)

The main difference between the conclusions at issue in *Frontier I* and those challenged here, is that, unlike ALJ McKenna, ALJ Devine did not accept Commander Diaz' testimony that the F/V SETTLER was "within the 1,000 yards" of the USCGC SPENCER's starboard side at 22:00.  As a basis for this contention, ALJ Devine considered that Commander Diaz' "visual observations were only approximations of the time and distance when the USCGC SPENCER passed the F/V SETTLER and observed it to identify the vessel and see whether it had nets in the water." (*Id.* at 27.)  Merely rejecting the "within 1,000 yards" observation in this context, however, is insufficient to justify the position of the F/V SETTLER at 21:58 because other aspects of Commander Diaz' testimony, which ALJ Devine accepted, contradict this conclusion.

To be sure, ALJ Devine accepted the 21:40, 21:47, 21:52, and 21:58 plots as identified in Agency Exhibit 14.  (AR10 VI Tab 66, p. 10 at ¶ 24, 11 at ¶ 30.)  If the 21:58 plot was accurate, the

---

properly sized to the F/V SETTLER or evidence of what constitutes the normal trawling speed, the assumptions made by Professor Goudey were "scientifically unfounded."  (AR10 IV, Tab. 57, p. 29.)

F/V SETTLER would have been 2,600 yards to the southeast[35] of the USCGC SPENCER at that time.  (AR10 VI Tab 66, p. 8; AR 04 V, Agency Ex. 14.)  Yet, ALJ Devine accepted Commander Diaz' testimony that "the USCGS SPENCER passed the [F/V SETTLER] in a starboard to starboard passage" at "approximately 22:00 or a short time after 22:00."  (AR10 VII, Tab. 67, p. 11 at ¶ 31; AR04 V, Agency Ex. 19.)  He also accepted that Commander Diaz and the lookout were able to observe visually that the vessel was a stern trawler with gear in the water.  (AR10 VII, Tab. 67, p. 11 at ¶ 31; Ar04 V, Agency Ex. 18; AR04 III, Tr. 70-73.)  Finally, ALJ Devine accepted that the USCGC SPENCER "initiated a 149-degree[36] turn to come around behind the vessel" at 22:01.  (AR10 VII, Tab. 67, p. 11 at ¶ 32; AR04 V, Agency Ex. 37; AR04 IV, Tr. at 595, 642.)  Thus, even assuming that the F/V SETTLER was further away than 1,000 yards of the USCGC SPENCER at approximately 22:00, the USCGC SPENCER still had to pass the F/V SETTLER by 22:01 in order for it to be able to make its turn "to come around behind" the F/V SETTLER on a starboard to starboard passage and in order for Commander Diaz and the look out to visually observe the F/V

---

[35]  The header log for the USCGC SPENCER indicates that its location was 39:59.955N in latitude values and 07:11.693W in longitude values at 21:58.  (AR04 V, Respondents' Ex. 1.)  The F/V SETTLER's was plotted by Quartermaster Coppola at the same time at 39:59.85N in latitude values and 70.11.76W in longitude values. (AR 04 V, Agency Ex. 14.)

[36]  The Administrator found, however, that the header log for the USCGC SPENCER shows the USCGC SPENCER initiated a 180-degree turn at 22:01.  (AR10 VI, Tab 66, p. 8.)

SETTLER's gear in the water.  As noted by Professor Ouellette, if the F/V SETTLER had moved at a speed of 5.7 knots, she would have been about 1,400 yards from the USCGC SPENCER at 22:00 and "would have presented a forward starboard aspect making it impossible to see lines trailing from the stern." (AR04 V, Tab. 41, p. 5.) Contrary to ALJ Devine's conclusion, this configuration would have therefore required the F/V SETTLER to travel at a speed higher than 5.7 knots.  (*Id.* at 6.)  This finding is supported by Commander Diaz' testimony.  While Commander Diaz testified that the time of his observation may have been approximate,[37] he repeatedly stated that the USCGC SPENCER passed the F/V SETTLER at a distance of "less than 1,000 yards," (AR04 V, Agency Ex. 19; AR04 III, Tr. at 70-73, 150.).[38]

Accordingly, I find substantial evidence supports the NOAA Administrator's conclusion that "it appears unlikely that the

---

[37]  For instance, Commander Diaz explained that "[t]he 2200 time is, quite frankly, an approximation in my mind because I put down 2200. I did not put down 2201 or 2207, or something more specific. It's sort of a round number. I put it approximately." (AR04 III, Tr. at 151.)  He also recalled that it was approximately 22:00 because it was before 22:05.  (*Id.*)

[38]  Frontier Fishing also contends that ALJ Devine erred in ruling that the F/V SETTLER need not have followed the straight line course from the A4 plot to the A5 plot at 22:08.  In this regard, I merely note, as I did in *Frontier I,* that "[e]vidence showing that the target did not follow a straight line would require the target to have traveled a greater distance in the same amount of time and thus at a higher speed."  429 F. Supp. 2d at 333.  This observation provides additional support for rejecting the ALJ Devine's finding that the F/V SETTLER would have been capable of moving from A4 to A5 within the alleged time frame.

*Settler* was within a 100-200 yards margin of error of the 21:58 plot position when that plot was taken by the Coast Guard." (AR10 VII, Tab. 67, p. 8.)  Even if the F/V SETTLER was at the very edge of the greater margin of error surrounding point A4 resulting from USCGC SPENCER's rapid intercept course, as explained by Dr. Peterson, it would have been impossible for the F/V SETTLER to traverse the distance from A4 to the inside of the USCGC SPENCER's turn, where all parties agree it was by 22:00. Consequently, I conclude that the radar plot at 21:58 was inaccurate because the F/V SETTLER could not have been at point A4 at 21:58.  *Frontier I*, 429 F. Supp. 2d at 332.

   2.   Effect of the Inaccuracy of the 21:58 Plot

   ALJ Devine considered that the recorded positions of A2, A3, and A4 were not, in any event, a required element of proof for NOAA because "[t]he charged violation requires only a finding the F/V SETTLER was fishing the restricted area at 21:40." (AR10 IV, Tab. 57, p. 27.)  Considering that any errors were less likely to occur at 21:40, when the two vessels were not on reciprocal courses and maintained consistent courses and speed, ALJ Devine concluded that "[t]he position of the F/V SETTLER established by the Coast Guard at 21:40 on October 16, 1997 is reliable and reasonably accurate" and therefore affirmed a finding of liability.  (AR10 IV, Tab. 57, p. 13 at ¶ 11, p. 26.) Furthermore, as shown in Agency Exhibit 14, the A4 plot placed radar contact 8174 approximately seven-tenths of one mile, or

1,400 yards, inside RGA1 at a range of 9,700 yards from USCGC SPENCER. (AR04 V, Agency Ex. 14; AR04 III, Tr. at 61-62.) Therefore, only a margin of error of approximately 15% could have placed the F/V SETTLER outside, rather than inside, RGA1.

At the discretionary review stage, the NOAA Administrator concurred with ALJ Devine's ultimate decision to affirm the fishing violation, on the ground that "[t]he fact that the 21:58 plot, taken when the vessels were closing in on each other at high speed, may not have been accurate does not, under the circumstances, undermine the reliability of the 21:40 plot or the other plots." (AR10 VI, Tab 66, p. 9.) As a basis for this conclusion, the NOAA Administrator found that the evidence did not support the conclusion that the Coast Guard made systematic errors in plotting the position of the F/V SETTLER. (*Id.*) There is substantial evidence to support this conclusion.

The inaccuracy of the 21:58 plot does not necessarily undermine the accuracy of the other plots under these circumstances. *First*, Frontier Fishing does not dispute the reliability of the other plots but merely argues that these plots were not the F/V SETTLER. Respondents' experts, Professor Goudey and Professor Ouellette, testified that the navigation system on the USCGC SPENCER was functioning properly. (AR04 III-IV, Tr. at 381, 638-39.) They also stated that the plots taken by the USCGC SPENCER's were reliable. (*Id.*) *Second*, there is a basis for concluding that errors were less likely to occur between 21:40

and 21:47, because the two vessels were not on reciprocal courses
and maintained consistent courses and speed.

This, of course, remains the most troubling aspect of the
case.  See *Frontier I*, 429 F. Supp. 2d at 330.  The 21:58 radar
contact at point A4 is inexplicable and ultimately irreconcilable
with all of the evidence.  The inaccuracy could cast some doubt
on NOAA's ability to trace the "footprints in the snow" back from
the F/V SETTLER's known position at 22:08, outside RGA1, to radar
contact 8174's position inside RGA1 at 21:40 with anything
approaching certainty.  However, the NOAA need not prove its
theory to the point of certainty.  Nor need it necessarily
demonstrate that all of the evidence fits neatly into its theory.
Instead, what NOAA must prove is that a preponderance of the
evidence weighs in favor of a finding the F/V SETTLER was
trawling inside RGA1 at some point.  In my review, I owe
substantial deference to the NOAA Administrator's
determination.[39]  The NOAA Administrator's decision to credit the
USCGC SPENCER's visual corroboration of its radar contact at
21:40 and discredit the reliability of the radar contact at 21:58
is founded in substantial evidence and constitutes a reasonable
resolution of a problematic evidentiary record.  *Hosp. Cristo
Redentor, Inc.*, 488 F.3d at 519. ("The possibility of drawing two

---

[39] Even if I might have made a different choice had this
matter been before me de novo, I am not at liberty to "displace
the Board's choice between two fairly conflicting views."
*Universal Camera Corp.* v. *N.L.R.B.*, 340 U.S. 474, 490 (1951).

inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."). Although the NOAA Administrator's decision does not reconcile all of the evidence – nor does any theory yet advanced in this case - nothing "clearly precludes the agency's decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence or both." *Penobscot*, 164 F.3d at 718 (internal alterations and quotations omitted).

Accordingly, I find that Frontier Fishing has failed to produce sufficient evidence adequately to rebut or discredit the reasonableness of NOAA's finding of liability. Under the circumstances, "it would have been possible for a reasonable jury to reach the [Agency's] conclusion." *Penobscot*, 164 F.3d at 718 (quoting *Allentown Mack Sales & Serv., Inc.* v. *Nat'l Labor Relations Bd.*, 522 U.S. 359, 366-67 (1998)). Consequently, I have concluded that the NOAA Administrator's decision to affirm the fishing violation is supported by substantial evidence.[40]

---

[40]  Lastly, Frontier Fishing contends that ALJ Devine erred in refusing to supplement the administrative record with the one-page document.  *See generally supra* Note 24.  For the reasons discussed in *Frontier I*, 429 F. Supp. 2d at 324-25, I find that ALJ Devine did not err in declining to allow Frontier Fishing to supplement the administrative record with this document in the absence of bad faith on the part of the NOAA.  There has been no such showing of bad faith.

## IV.   CONCLUSION

For the reasons set forth more fully above, I have denied Frontier Fishing's motions for summary judgment (Dkt. No. 9) and discovery (Dkt. No. 18), and granted the Defendants' motion to affirm the NOAA's decision (Dkt. No. 13). The Clerk shall now enter judgment for the defendants affirming the NOAA Administrator's conclusion that Frontier Fishing was liable for fishing illegally on October 16, 1997 and, consequently, subject to the sanctions specified.


*/s/ Douglas P. Woodlock*
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE